SUE A. GALLAGHER, City Attorney (SBN 121469)
ROBIN B. HAMMOND, Assistant City Attorney (SBN 213432)
City of Santa Rosa
100 Santa Rosa Avenue, Rm. 8
Santa Rosa, California 95404
Telephone: (707) 543-3040
Fax: (707) 543-3055

Attorneys for Defendants CITY OF SANTA ROSA, JOHN CREGAN, MARASKESHIA SMITH, MEGAN BASINGER, CHRIS ROGERS, OFFICER MOORE

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA – San Francisco Division

| | |
|---|---|
| ROBIN COSER, ADAN ALVAREZ, FORREST JOWLER, JOHN GRAHAM, <br><br> Plaintiffs, <br><br> v. <br><br> CITY OF SANTA ROSA, JOHN CREGAN, MARASKESHIA SMITH, MEGAN BASINGER, CHRIS ROGERS, OFFICER MOORE, DOES 1-10 INCLUSIVE, <br><br> Defendants. | CASE NO.: 22-cv-04488-SI <br><br><br> Date: August 11, 2022 <br> Time: 11:00 a.m. <br> Location: Zoom <br><br><br><br> Assigned Judge: Honorable Susan Illston. |

## I.

## INTRODUCTION

Defendants City of Santa Rosa, John Cregan, Maraskeshia Smith, Megan Basinger, Chris Rogers, and Officer Moore (hereinafter "City Defendants") submit the following opposition to Plaintiffs' Motion for Temporary Restraining Order and Request for Preliminary Injunction. Additionally, City Defendants provide this Court with an update of the City's outreach efforts in connection with the planned clearing of the recreational vehicle encampment located at Challenger Way, as originally noticed for August 4, 2022.

-1-

## II.

## FACTS

Plaintiffs are all individuals currently experiencing homelessness who are living in recreational vehicles ("RV's") parked on a road in Santa Rosa, Challenger Way. (See Declaration of Sgt. Barrett, ¶ 2, page 2, lines 3-7, Filed Contemporaneously with this Response.) The entire street has signage which prohibits overnight parking in the area. (See Declaration of Sgt. Barrett, ¶ 2, page 2, lines 6-7.) Plaintiffs are part of a much larger encampment, including over thirty vehicles, approximately half of which are RV's. (See Declaration of Sgt. Barrett, ¶ 2, page 2, lines 3-6.) There are no public restrooms or RV hookups on or near Challenger Way and, in recent weeks, the area has become increasingly littered with human waste, trash, and used needles. (See Declaration of Sgt. Barrett, ¶ 3, page 2, lines 8-13.) The two vacant fields that abut Challenger Way are filled with dry grass and patrolling officers have observed hundreds of cigarette butts in those fields, obviating a grave risk of fire in a community that has endured two devastating wildfires within the past five years. (See Declaration of Sgt. Barrett, ¶¶ 6-7, pages 2:22-3:3.) The numerous storm drains on Challenger Way provide unfiltered, direct access to streams which feed into the Russian River and Pacific Ocean, have been contaminated with human waste, garbage, and other debris from the encampment. (See Declaration of Sgt. Barrett, ¶ 3, page 3, lines 8-13.)

Given all of these serious issues related to public health and safety created by the Challenger Way encampment, City Defendants determined that it was appropriate to take steps toward clearing the RV encampment and posted notices warning of the planned closure. Meanwhile, Catholic Charities, a nonprofit organization that receives City funding and is in contract with the City to provide access to shelter and wraparound services to individuals experiencing homelessness in the City, was making contact with individuals potentially impacted by the planned encampment closure. (See Declaration of Lee Roccio, ¶¶ 2-3, pages 1:28-4:9.)

Catholic Charities, through its Homeless Outreach Services Team, or HOST, has contacted each of the four named plaintiffs individually and has offered each plaintiff a range of different services, including offers of shelter as well as other wraparound services. (See Declaration of Lee Roccio, ¶ 3(a)–(d), pages 2:6–4:9.)

1. Plaintiff Robin Coser has been offered an accommodation for her cat to live inside her RV so that Ms. Coser may participate in the Safe Parking Program, which provides a clean and safe place for her to park her RV and also provides her with a variety of wraparound services. (See Declaration of Lee Roccio, ¶ 3(a), page 2, lines 10-20.) Ms. Coser is set to start participation in Safe Parking on August 13, 2022. (See Declaration of Lee Roccio, ¶ 3(a), page 2, lines 18-20.)

2. Plaintiff Adan Alvarez has been offered: (1) shelter at Sam Jones Hall, which he declined; (2) participation in the Safe Parking Program, which he declined because (a) his children visit on weekends and (b) he did not want to have his dogs spayed or neutered, which is a requirement of the program; (3) the Family Support Center, which he also declined; and (4) Rapid Rehousing, which assistance he accepted. (See Declaration of Lee Roccio, ¶ 3(b), pages 2:21-3:10.) Rapid Rehousing will pay Mr. Alvarez's deposit, first month's rent, 70% of the second month's rent, and 50% of the third month's rent for a rental unit that he locates. (See Declaration of Lee Roccio, ¶ 3(b), page 3, lines 7-9.) Mr. Alvarez has a future appointment with HOST to assist him with this program that is set up for August 12, 2022. (See Declaration of Lee Roccio, ¶ 3(b), page 3, lines 9-10.)

3. Plaintiff John Graham has been offered: (1) shelter at Sam Jones Hall, which he declined; (2) participation in the Safe Parking Program, which he declined; (3) the Family Support Center, which he also declined; and (4) Rapid Rehousing, which assistance he accepted. (See Declaration of Lee Roccio, ¶ 3(c), page 3, lines 11-26.) Rapid Rehousing will pay Mr. Graham's deposit, first month's rent, 70% of the second month's rent, and 50% of the third month's rent for a rental unit that he locates. (See Declaration of Lee Roccio, ¶ 3(c), page 3, lines 24-26.) Mr. Graham has an appointment set up with HOST on Tuesday, August 9, 2022, to assist him with a search for appropriate housing using the Rapid Rehousing program. (See Declaration of Lee Roccio, ¶ 3(c), page 3, lines 22-24.)

4. Plaintiff Forrest Jowler has also been contacted by HOST and has been offered shelter at Sam Jones Hall, which he declined, and Safe Parking, which he declined but agreed to be placed on the waiting list in case he changes his mind. (See Declaration of Lee Roccio, ¶ 3(d), pages 3:27-4:6.) Mr. Jowler was also offered Rapid Rehousing, Coordinated Entry, Homeless

Service Center, and HOST services. (See Declaration of Lee Roccio, ¶ 3(d), pages 3:27-4:1.) He completed paperwork for the Coordinated Entry program, which will place him on a list for Permanent Supportive housing throughout the County of Sonoma and the timeframe for that housing will depend upon his VI-SPDAT score (Vulnerability Index Service Prioritization Decision Assistance Tool). (See Declaration of Lee Roccio, ¶ 3(d), page 4, lines 6-9.)

## III.

## LEGAL ARGUMENT

### A. Plaintiffs are Unable to Meet Initial Burden

The standard for a temporary restraining order is the same as for a preliminary injunction. See *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). To succeed on a motion for preliminary injunction, a party must show that (1) they are likely to succeed on the merits of their claim; (2) they will suffer irreparable harm in the absence of relief; (3) the balance of hardships tips in their favor; and (4) a preliminary injunction is in the public interest. See *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008).

When balancing both parties' harms, the court "[s]hould pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (quotation omitted). When the government is the target of the injunction, these factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Moreover, Courts afford substantial judicial deference to public safety officials to make local public safety determinations. See *Yamaha Corp. of America v. State Bd. Of Equalization*, 19 Cal.4th 1 (1998); *Harrott v. County of Kings*, 25 Cal.4th 1138, 1155 (2001).

As detailed in Sgt. Barrett's Declaration, there are numerous, overriding public health and safety concerns that warrant City action regarding the Challenger Way encampment. There is a grave risk of fire danger in a community that has very recently been devastated by wildfires. There is ongoing environmental impact caused by human waste and other debris, including unfiltered infiltration of these contaminants into local waterways. There are traffic hazards created by the locations of the RV's and related items. Also, it should be noted that all of the RV's are parked in an area where the City has designated no overnight parking, with signage to that effect located

throughout the area.

The City has an obligation to the public at large to ensure that serious issues involving community health and safety are resolved expeditiously. The fire danger and ongoing environmental impact caused by the Challenger Way encampment, located in an area where overnight parking has already been prohibited by the City, are two issues which, standing alone, justify a swift closure of the Challenger Way encampment.

**B.     The *Martin* case does not address RV encampments**

Plaintiffs rely upon the holding of *Martin v. City of Boise*, 920 F.3d 586 (9th Cir. 2019), in support of their argument that the City must provide alternative shelter to each plaintiff prior to closing the encampment of RV's located in the restricted parking area of Challenger Way. The City notes, however, that the facts presented by *Martin* are immediately distinguishable from the situation at bar. First, unlike the situation presented in the *Martin* case, each of the four plaintiffs here lives inside of their own, mobile, recreational vehicle. *Martin* held that "[a]n ordinance violates the Eighth Amendment insofar as it imposes criminal sanctions against homeless individuals for sleeping outdoors, on public property, when no alternative shelter is available to them." *Martin*, 920 F.3d at 604.

None of the plaintiffs in this matter are sleeping outdoors on public property; rather, the issue presented in this case is one of illegal overnight parking and the detrimental impact that the accumulation of waste and other debris is presenting to the safety of the community as a whole arising from the vehicle encampment formed in defiance of City parking prohibitions. Each of the four plaintiffs in this case have operational RV's in which they are residing. The plaintiffs here are not sleeping outdoors; they are living within their own vehicles.

The *Martin* court was careful to circumscribe its holding accordingly:

> We hold only that "so long as there is a greater number of homeless individuals in [a jurisdiction] than the number of available beds [in shelters]," the jurisdiction cannot prosecute homeless individuals for "involuntarily sitting, lying, and sleeping in public." . . . That is, as long as there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public

property, on the false premise they had a choice in the matter.

*Martin*, 920 F.3d at 617 (internal citations omitted).

To expand the holding of *Martin* such that a City may no longer regulate parking or vehicle enforcement within its boundaries pushes the breadth of that opinion beyond what is tenable. *Martin* addressed the circumstance wherein an individual experiencing homelessness and lacking shelter had no option other than to sleep on public property. The fact that each plaintiff here has their own shelter in the form of a privately owned recreational provides an immediately distinguishable circumstance presented by this case.

Moreover, the United States Supreme Court has long recognized that a City has considerable power to regulate vehicle traffic within its jurisdiction. See, e.g., *City of Chicago v. Atchison*, 357 U.S. 77, 88 (1958) ("[T]he City retains considerable authority to regulate how transfer vehicles shall be operated. It could hardly be denied, for example, that such vehicles must obey traffic signals, speed limits and other general safety regulations. Similarly the City may require registration of these vehicles and exact reasonable fees for their use of the local streets."). And, in California, the Ninth Circuit has also long recognized that municipalities have the authority to establish parking enforcement agencies and that law enforcement officers may also enforce parking violations. See *United States v. Choudhry*, 461 F.3d 1097, 1101 (9th Cir. 2006). This kind of basic enforcement as it relates to the operation and parking of vehicles within the City is not limited by *Martin*.

**C.  Assuming, *Arguendo*, that *Martin* Does Apply, the City is in Compliance**

Even assuming, *arguendo*, that the *Martin* opinion should be read to include all individuals living in recreational vehicles, the City remains in compliance with the requirements of that holding. Here, as detailed, *supra*, each of the four plaintiffs have been offered alternative shelter through HOST. Despite the fact that shelter was offered, each of the plaintiffs have made individualized determinations as to whether or not to accept the multiple offers for services and shelter. Ultimately, all four of the plaintiffs have accepted assistance in some from that has been offered by HOST. This is all that is required by the *Martin* opinion. It is incumbent upon the individual to decide whether or not to accept the offer of shelter that has been made. "[A]s long as

there is no option of sleeping indoors, the government cannot criminalize indigent, homeless people for sleeping outdoors, on public property, on the false premise they had a choice in the matter." *Martin*, 920 F. 3d at 617.

D.     **There is No State Created Danger**

Plaintiffs also assert that requiring them to move their recreational vehicles from the current location at Challenger Way would cause a state created danger. The City respectfully disagrees and points to the case of *Cobine v. City of Eureka*, 250 F. Supp. 3d 423 (N.D. Cal. 2017) as persuasive authority in support of this position. There, in response to a similar argument posed by residents of a homeless encampment located in Eureka, California, the district court made the following observations and dismissed the plaintiffs' claims:

> The general circumstances of being homeless in Humboldt County cannot be minimized. Without allegations of intentional eviction during precarious weather or other facts indicating deliberate indifference to the safety and welfare of the population, the Court must dismiss the claim. . . . The specific allegations here of state action regarding finding temporary shelter alternatives or moving a substantial portion of the population to a parking lot from public land does not rise to the level required by the stringent standard of deliberate indifference.

*Cobine*, 250 F. Supp. 3d at 433.

Here, the City has not proceeded with enforcement and has continued to work with each of the individual plaintiffs to locate a shelter or housing situation that is available and workable for each plaintiff. Additionally, the fact that each plaintiff continues to reside within his or her own recreational vehicles presents an immediately distinguishable circumstance in this situation.

E.     **Relief Sought Should be Limited to Named Plaintiffs Only**

Further, because Plaintiffs are *Pro Se* Litigants, it should be noted that they cannot pursue claims on behalf of others and the Court should only focus on the validity of their individual claims. *See United States ex rel. Mergent Services v. Flaherty*, 540 F. 3d 89, 92 (2d Cir. 2008) ("Because [28 U.S.C. § 1654] permits parties to 'plead and conduct their own cases personally' ... we have held that 'an individual who is not licensed as an attorney may not appear on another person's

behalf in other other's cause."'") As such, although "[a] nonattorney may appear in *propria persona* in his own behalf, that privilege is personal to him," and he has "[n]o authority to appear as an attorney for others than himself." *C.E. Pope Equity Trust v. United States*, 818 F. 2d 696, 697 (9th Cir. 1987).

## III.
## CONCLUSION

Accordingly, based upon the forgoing points and authorities as well as upon the record presently before the Court, the City Defendants respectfully request that the Court decline to issue the requested emergency temporary restraining order or preliminary injunction so that the City can resume plans to clear the remaining individuals from the encampment located on Challenger Way, clean the area, and appropriately resolve the serious ongoing public safety concerns related to fire danger and environmental harm caused by the current encampment.

Respectfully Submitted,

Dated: August 9, 2022

/s/ *Robin B. Hammond*
ROBIN B. HAMMOND
Assistant City Attorney
Attorneys for City Defendants